ERNEST HOYLE, Guardian ad Litem for Totisha Shannette Mason and Gerald Allen Mason, Jr., Minor Children of Gerald Allen Hoyle, Deceased, Employee, Plaintiff v. ISENHOUR BRICK & TILE COMPANY, Employer, LIBERTY MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. 8110IC450

(Filed 16 February 1982)

**Master and Servant § 60— workers' compensation—using forklift contrary to orders—uncompensable accident**

The Industrial Commission did not err in determining decedent's accident did not arise out of and in the course of the deceased employee's employment as the decedent's fatal injury resulted after he abandoned his duty station, attempted to drive a forklift after being expressly prohibited from using it, and was removing culled bricks to an area where they were not supposed to be.

Judge MARTIN (Harry C.) dissenting.

APPEAL by plaintiff from the North Carolina Industrial Commission opinion and award of 8 January 1981. Heard in the Court of Appeals 11 December 1981.

This claim was filed on behalf of the 20-year-old decedent's two illegitimate children, one of whom was born after decedent was killed on the premises of defendant while he was attempting to drive one of defendant's forklifts. Decedent was not employed as a forklift operator and had twice been expressly forbidden to do so. An award denying compensation was entered and plaintiff appealed.

Decedent was employed in defendant's brickyard as a cull stacker at the No. 6 building. Broken bricks were culled from the quality bricks and taken by conveyors to plaintiff's duty station. His job was to stack the culls and then fasten a steel band around them "like a box." He did not have any overlapping duties. Others were employed and trained as forklift operators. The duties of a forklift operator included moving the stacked bricks to specific areas on defendant's premises. Forklift operators also helped transfer and clean the cars.

It was a violation of company rules for anyone other than a forklift operator to attempt to operate a forklift. About two weeks prior to the fatal accident, one of decedent's supervisors caught him driving a forklift in violation of the policy. Decedent

was told if he was caught again, disciplinary action would be taken, and he would either be suspended or terminated.

Decedent was last seen alive by a regular forklift operator, Wilkins, driving a forklift. As they drove along together, decedent talked about spending the night with Wilkins and painting a house decedent had rented. Decedent accompanied Wilkins to Wilkins' destination. The pair sat and talked about personal matters for awhile. Wilkins then deposited his load of bricks and left. This site was not where the cull bricks were supposed to be stored. Culls were supposed to be placed on the side of the building where decedent was employed to work. When Wilkins returned with another load, he discovered that the forklift had been overturned and that the body of decedent was underneath the empty forklift. There were skid marks on the pavement behind the forklift. The cull bricks had been left next to the quality bricks Wilkins had just deposited.

Another employee of defendant, Rollins, was employed as the forklift operator designated to take out the cull bricks stacked and banded by decedent. He testified that decedent stacked culls right outside the building. "There was not really any limit as to how many culls he could stack out there before I moved the culls." Rollins was also supposed to help transfer cars. He left his forklift for about thirty minutes to help transfer cars, and when he returned, the accident had occurred. Although he had no authority to do so, he had told decedent he could drive the forklift.

There was evidence that other unauthorized personnel had driven forklifts at defendant's plant. Defendant's supervisor testified, however, that he did not know of anyone who had persisted in the proscribed activity after being caught and warned one time. Sometime after the accident, an employee was fired on the spot for attempting to operate a forklift without authority. The principal reason people were employed and trained for the specific position of forklift operators was because forklifts are "unique and very dangerous due to the short turning radius, suspended load, poor visibility, narrow wheel base, the weight and it's by nature just a bad piece of equipment." The center of gravity is above the wheels when is is being operated without a load. There is a counterweight of about 1500 pounds located in

Hoyle v. Isenhour Brick & Tile Co.

the rear of the lift above the steering wheel. When the forklift is being operated without a load on the forks, the forks should be lowered to about six inches from the ground to help offset the counterweight. When the lift is empty the wheels have a tendency to shimmy. If the forks are close to the ground, they can be dropped and the machine stabilized. When defendant's employees arrived at the scene of the accident, the lifts on the machine defendant had attempted to operate were two or three feet high instead of the six inches required for safe operation.

The Deputy Commissioner's findings of fact include the following:

"7. The deceased employee was employed with the defendant employer as a cull brick stacker at the Number 6 building.

8. On the evening of June 5, 1978 the deceased employee was operating a small forklift and a fellow employee, Wilkins, was operating a large forklift. They were together. The fellow employee unloaded his bricks. The deceased employee and the fellow employee talked together about the deceased employee spending the night with the fellow employee. This area was not the place to put the cull bricks. After the fellow employee unloaded his load of good bricks he went after another load and when he came back he saw the deceased employee under the forklift that he was operating. The forklift was turned over on top of him. It was not the deceased employee's job to operate a forklift.

9. The defendant employer had rules and regulations about who was to operate the forklifts and only those who were approved and authorized to operate the forklifts were permitted to do so. The deceased employee was not authorized nor approved to operate a forklift. Wilkins, the fellow employee, was authorized to operate forklifts. There were other employees who were not authorized to operate forklifts who did so on occasions but this was not known to the defendant employer's supervisors.

10. Rollins, another fellow employee, was authorized to operate forklifts and on the evening in question he let the deceased employee borrow his forklift to take some cull

bricks out. Rollins was helping a fellow employee to transfer cars at that time. Rollins had let the deceased employee borrow his forklift the night before to take out cull bricks. Rollins had no authority to let the deceased employee use his forklift.

11. It was the deceased employee's job to take cull bricks off the machine and stack them in a cull stack and put a steel band around them. There was a rule stating that no untrained employee was to operate any machinery including forklifts. This rule was known to the defendants' employees.

12. Two weeks prior to the accident giving rise to this claim the defendant's supervisor, Hamilton, took the deceased employee off the forklift because he was not authorized to operate it. Hamilton talked with the deceased employee about the rules and regulations about the use of the forklifts and was told that he was not authorized to operate a forklift and that in the event he was caught again he would have to take disciplinary action which would be suspension to termination. The deceased employee's supervisor was not aware that the deceased employee had operated a forklift before.

13. Wofford, a plant maintenance supervisor for the defendant employer, had seen the deceased employee operating a forklift about three or four months before June 9, 1978. The deceased employee was stopped and taken off the forklift because he was not a forklift operator. The deceased employee was told if he was caught again disciplinary action would be taken and that he could be terminated.

14. Contrary to instructions of the defendant employer's supervisor, the deceased employee was operating a forklift on the occasion when it turned over on him resulting in his death. The deceased employee was not at the place he was employed to work when the accident occurred.

15. A forklift is a dangerous piece of machinery and for that reason defendants' untrained employees were forbidden to operate them.

16. The accident giving rise to this claim did not arise out of and in the course of the deceased employee's employment."

Hoyle v. Isenhour Brick & Tile Co.

Based on the foregoing, the Deputy Commissioner denied plaintiff's claim for benefits. The full Commission affirmed.

*Leonard, Austin, McNeely and MacMillan, by Thomas A. McNeely, for plaintiff appellant.*

*Hedrick, Feerick, Eatman, Gardner and Kincheloe, by J. A. Gardner III, for defendant appellees.*

VAUGHN, Judge.

Plaintiff does not bring forward or argue any exceptions to the Commission's findings except No. 16 which, he argues, is not supported by the evidence. He further argues that the Commission should have found that deceased's actions were required in order for him to perform his usual job and were calculated to further his employer's business. We overrule plaintiff's assignments of error and affirm.

The question of whether the accident arose out of and in the course of employment is a mixed question of fact and law. When the Commission finds that the accident did not arise out of and in the course of the employment, such conclusion must stand unless under no view of the facts found by the Commission such conclusion is warranted. *Davis v. Mecklenburg Co.*, 214 N.C. 469, 199 S.E. 604 (1938); *Lockey v. Cohen, Goldman & Co.*, 213 N.C. 356, 196 S.E. 342 (1938). The burden of proof, of course, is on plaintiff to prove that the accident arose out of and in the course of the employment.

Since plaintiff does not bring forward and argue any exceptions to the other findings made by the Commission, the question on appeal is whether, *under any view of the facts found,* the finding that the accident did not arise out of and in the course of decedent's employment is warranted.

Plaintiff argues that the only evidence on which the Commission could deny the claim is the evidence of the violation of a safety rule. Citing *Hensley v. Caswell Action Committee*, 296 N.C. 527, 251 S.E. 2d 399 (1979), and *Hartley v. Prison Department*, 258 N.C. 287, 128 S.E. 2d 598 (1962), plaintiff contends the Commission should have found that decedent's accident arose out of and in the course of his employment. We disagree.

To be compensable, an accident must arise out of and in the course of employment. G.S. 97-2(6). "The words 'in the course of the employment' . . . refer to the time, place and circumstances under which an accidental injury occurs; the phrase 'arising out of the employment' refers to the origin or cause of the accidental injury." *Robbins v. Nicholson,* 281 N.C. 234, 238, 188 S.E. 2d 350, 353 (1972).

*Hensley v. Caswell Action Committee, supra,* and *Hartley v. Prison Department, supra,* are distinguishable from the case at hand. In *Hensley,* the claimant was employed to cut weeds along the banks of a reservoir. Although he had received general instructions not to go into the water, the employee attempted to wade across the reservoir in order to reach some weeds on the opposite bank. He drowned. The claimant in *Hartley* was employed as a prison guard. His duties included checking around the prison fence and relieving the tower guards. Rather than walk through the gate to reach the tower guards, he tried to climb over the "nonclimbable" barbed fence and was injured. In both cases, the Supreme Court affirmed an award of compensation.

Ordinarily, violation of an employer's safety rule, standing alone, is an insufficient basis upon which to deny compensation. The significant finding in those cases relied on by plaintiff was that the violations occurred while the employees were attempting to perform their *assigned* jobs. 296 N.C. at 531, 251 S.E. 2d at 401; 258 N.C. at 290, 128 S.E. 2d at 600. The Commission, therefore, found that the accidents arose out of and in the course of employment.

The present cause more closely resembles *Taylor v. Dixon,* 251 N.C. 304, 111 S.E. 2d 181 (1959). In *Taylor,* the employee's regular job was to saw down trees. He was injured, however, while driving a tractor pulling logs. The employer argued at the hearing that the employee had stepped outside the boundaries of his work: "The reason I told him not to drive the tractor was because that was not his job. He was employed to run the chain saw. . . . I didn't hire him as a tractor driver." The Supreme Court held that the employer was entitled to a specific finding on this defense. In remanding the case to the Industrial Commission, the Court cited with approval the following language from Larson:

"[I]f the unrelated job is positively forbidden, all connection with the claimant's own employment disappears, for he has stepped outside the boundaries defining, not his method of working, but the ultimate work for which he is employed."

1A A. Larson, The Law of Workmen's Compensation § 31.14 (1979) [hereinafter cited as Larson].

*Morrow v. Highway Commission*, 214 N.C. 835, 199 S.E. 265 (1938), and *Teague v. Atlantic Co.*, 213 N.C. 546, 196 S.E. 875 (1938), are also instructive. In *Morrow*, an employee dropped his paintbrush in the river while painting a bridge. Despite instructions not to do so, he jumped in to retrieve the brush and was drowned. Obviously retrieval of the paintbrush could be said to have been in furtherance of his employer's business. The Commission concluded, however, that deceased had left the usual scope of his employment and denied compensation. The Court affirmed. In *Teague*, the employee was killed while riding a crate elevator from the basement to the first floor instead of taking the stairs as directed by his employer. There, as here, the employee had been previously reprimanded for riding the elevator because of its danger and had been forbidden to do so again. The Commission found that no duty of the employee required or contemplated that he should ride the empty crate elevator. Compensation was denied, and the Court affirmed.

As in *Taylor*, *Morrow* and *Teague*, in the present cause, the decedent did more than simply violate a rule as to the *method* of his assigned work. Indeed, by operating a forklift in violation of his employer's instructions, he actually assumed the duties of another job. *See* 1A Larson § 31.00. *See, e.g., Cohen v. Birmingham Fabricating Co.*, 224 Ala. 67, 139 So. 97 (Ala. 1932) (sales manager killed while unloading a car of steel with a crane); *Burch v. Ramapo Iron Works*, 210 A.D. 506, 206 N.Y.S. 868 (1924) (operator of an air hammer killed while helping at the furnace); *Shoffler v. Lehigh Valley Coal Co.*, 290 Pa. 480, 139 A. 192 (1927) (brakemen killed while driving the locomotive).

The recognition of the right of employers to establish job descriptions and employment boundaries becomes increasingly important as industrial operations become more complex with more sophisticated and dangerous equipment. Specialized jobs not only promote efficiency but also allow employers to guard against accidents caused by unskilled labor. For that reason, the modern

trend is to deny compensation when an employee steps outside his regular duties and performs an unrelated job which has been positively forbidden. 1A Larson §§ 27.14, 31.14. *See, e.g., Cohen v. Birmingham Fabricating Co.*, 224 Ala. 67, 139 So. 97 (1932).

We recognize that there are cases where employees injured while reasonably acting in good faith to assist a coemployee in the latter's work have received compensation. In those cases, however, the injured employee's activity did not amount to the *expressly prohibited* assumption of another's job at great risk. *See* 1A Larson § 27.11. Here the employee's act was expressly prohibited and there is nothing to indicate it was done in good faith. Instead, it was done in open defiance of his employer's earlier censure.

Plaintiff also argues that the Commission erred in failing to make a finding on whether decedent was performing a service calculated to further the business of the employer at the time of his injury. In the first place, the other findings of the Commission to which no exceptions are preserved would negate a positive finding on that question. Secondly, there was no evidence that would have supported a positive finding. The evidence was that it was decedent's duty to stack the culled bricks and then band them "like a box." Although the "box" decedent removed was full, "[t]here was not really any limit as to how many culls he could stack out there before I [the forklift operator] moved the culls." The forklift operator had not been gone more than about 30 minutes before the accident. Decedent's abandonment of his duty station, his attempt to drive the forklift against direct orders and in face of the threat of being fired and his unauthorized removal of the culled bricks to an area where they were not supposed to be, would compel the conclusion that his conduct was not calculated to further the business of his employer.

Moreover, not every act which is calculated to further an employer's interest is considered within the course of employment. In *Cohen v. Birmingham Fabricating Co., supra*, a sales manager was killed while assisting laborers unload a car of steel by use of a crane. Plaintiff argued that the manager's acts were designed to help fill his employer's orders promptly. The court held that the manager's intentions were insufficient to impose liability on the company:

"However interested Lambert may have been in seeing that the orders he procured were promptly and correctly filled, the evidence is ample to the effect that his assisting the laborers in unloading steel with the crane was not only *not reasonably related to the service he was employed to render*, but was also in direct violation of the instructions given him by the defendant's manager."

224 Ala. at 69, 139 So. at 98.

In summary, we distinguish the present case from those involving an employee's violation of his instructed *method* of work in performing his own job or those cases where the employer routinely or carelessly tolerates violations of its rules. We also distinguish it from cases involving an employee's innocent or inconsequential departure from his line of duty. The cases involving "reasonable activity" apply only if the employee is *where* he is supposed to be to perform what he is employed to do. The findings of the Commission, uncontested on appeal, establish that decedent left the job for which he was employed and attempted to perform another job in the face of direct orders not to do so after being warned of the dangers involved.

The accident, as are all, is of course regrettable. The Commission, however, found that it did not arise out of and in the course of the employment. That conclusion must stand unless there is no view of the facts found by the Commission that would warrant the conclusion. For the reasons stated, we conclude that the facts found, now uncontested, warrant the conclusion reached for several reasons.

Affirmed.

Judge WELLS concurs.

Judge MARTIN (Harry C.) dissents.

Judge MARTIN (Harry C.) dissenting.

In my opinion, the conclusion by the Commission that Gerald Hoyle's death did not arise out of and in the course of his employment was erroneous. The facts of this case are closely analogous to *Hensley v. Carswell Action Committee*, 296 N.C. 527, 251 S.E.

2d 399 (1979), and *Hartley v. Prison Department,* 258 N.C. 287, 128 S.E. 2d 598 (1962). In *Hartley,* the claimant was injured when, in the performance of his duty to go to a guard tower outside a high wire fence, he elected to climb over the fence rather than take the route around by the gate. In *Hensley,* the employee drowned while attempting to wade across a reservoir to complete his work of cutting weeds. In the present case, the employee undertook to remove the brick in an effort to get his own work done, thereby furthering his employer's business.

Larson states the question as follows:

It frequently happens that an employee will have his work stopped by some clogging, lack of oil, or disrepair of his machine. Quite commonly, also, there will be a company rule forbidding the operator to attempt to deal with the situation, and requiring him to wait until the specialists — whether oilers, electricians, or other repairmen — arrive on the scene. Sometimes the operator decides he can make the repair without the delay involved in calling the experts, and sometimes he gets hurt because he underestimated the expertness required or overestimated his own versatility. Now, the question is: has he departed from the course of his employment? He has attempted another person's job in violation of instructions. Yet the fact remains that he is attempting to get his own work done, although in forbidden fashion. Cases presenting these facts have gone both ways, depending on whether attention was focused on the fact that the job belonged to another or the fact that 'the action was a method of advancing the employer's work. . . .

As a matter of compensation theory, it is quite permissible to treat the incidental invasion of another employee's province as merely a forbidden route on the main journey to the ultimate objective, the performance of claimant's work.

1A A. Larson, The Law of Workmen's Compensation § 31.14(b) (1979).

Certainly, Hoyle's death was an accident within the meaning of the Act. *Harding v. Thomas & Howard Co.,* 256 N.C. 427, 124 S.E. 2d 109 (1962). Likewise, his death occurred in the course of his employment: he was on the job and moving brick from his sta-

tion so that he could continue stacking cull brick from the conveyor, his primary duty. The question remains whether his death arose out of his employment. His primary duty was to stack cull brick from the conveyor. Another employee was to remove the stacked brick by the use of a forklift truck so that Hoyle could continue his work. This fellow employee was engaged in other duties at a time when it was necessary to move the brick. Upon Hoyle's request, the forklift operator gave Hoyle permission to use the forklift to remove the brick. Though it is true that Hoyle's supervisor had told Hoyle on other occasions that he was not to operate the forklift, he and other employees had done so thereafter without incident. His actions were not for his own personal convenience or for the thrill of performing a hazardous feat, as in *Teague v. Atlantic Co.*, 213 N.C. 546, 196 S.E. 875 (1938). Nor did Hoyle disobey a direct order by a supervisor then present as in *Morrow v. Highway Commission*, 214 N.C. 835, 199 S.E. 265 (1938). *Morrow* also involved the deceased's attempting to perform an obviously dangerous act, swimming in the Catawba River.

As Justice Higgins concluded in *Hartley, supra:*

> The essence of the story in this case may be told in few words: Usually the idea of a short cut is attractive. Sometimes it is dangerous. To follow the [defendant's] contention would require us to hold that contributory negligence in this case is a complete defense. Our cases construing the Act hold to the contrary.

258 N.C. at 291, 128 S.E. 2d at 601.

I find that Hoyle's actions in removing the brick for the benefit of his employer by operating the forklift, although in violation of his previous instructions, are not so extreme as to break the causal connection between his employment and his death. *Hensley, supra.* Hoyle's death arose out of his employment. Accordingly, I vote to reverse the Commission's decision.